UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                     .     Case No. 23-13359(VFP)
                           .
BED BATH & BEYOND, INC.,   .
                           .
         Debtor.           .
. . . . . . . . . . . . ..
MICHAEL GOLDBERG, as       .     Adv. No. 24-01367(VFP)
Plan Administrator,        .
                           .
         Plaintiff,        .     M.L.K. Federal Building
                           .     50 Walnut Street, 3rd Floor
         v.                .     Newark, NJ 07102
                           .
WORLD DISTRIBUTION         .
SERVICES, LLC,             .
                           .
         Defendant.        .     July 15, 2025
. . . . . . . . . . . . ..        10:33 a.m.
```

TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Plan           ASK LLP
Administrator:         BY:  NICHOLAS C. BROWN, ESQUIRE
                       60 East 42nd Street
                       46th Floor
                       New York, NY 10165


Audio Operator:        Mariela Primo
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):


For the Defendant:          Tucker Ellis LLP
                            BY: THOMAS RICHARD FAWKES, ESQUIRE
                            233 South Wacker Drive
                            Suite 6950
                            Chicago, IL 60606

                            Tucker Ellis LLP
                            BY:  MAHA KABBASH, ESQUIRE
                            1776 On the Green
                            67 E. Park Place
                            Suite 900
                            Morristown, NJ 07960

1          THE COURT:  Call Goldberg versus World Distribution

2    Services, LLC, 24-1367.  It's the defendant, World Distribution

3    Services' motion for summary judgment.

4          May I have appearances, please?

5          MR. BROWN:  Nick Brown, here on behalf of the Plan

6    Administrator.

7          THE COURT:  Good morning.

8          MR. BROWN:  Good morning, Your Honor.

9          MS. KABBASH:  Good morning, Your Honor, Maha Kabbash

10   from the Tucker, Ellis law firm, Morristown office, and I'm

11   here with my partners, Tom Fawkes and Brian Jackiw, from our

12   Chicago office.

13         THE COURT:  Okay.  Good afternoon -- good morning.

14         MS. KABBASH:  Thank you.

15         MR. FAWKES:  Good morning, Your Honor.

16         MR. JACKIW:  Good morning, Your Honor.

17         THE COURT:  Yes.  Mr. Fawkes was here not long ago on

18   a completely different matter, but, yeah.  All right.  So, who

19   is going to be arguing for World Distribution Services?

20         MR. FAWKES:  Your Honor, I will be.

21         THE COURT:  You will?  Okay.

22         I have a couple of questions.  I read the papers, and

23   I have some questions.

24         MR. FAWKES:  Okay.

25         THE COURT:  All right?

1          MR. FAWKES:  All right.

2          THE COURT:  For both sides, but I'm going to start

3  with -- I'm going to start with World Distribution Services.

4  Okay.  So, I know there's a lot of back and forth about

5  disputed facts, but -- and whether they're relevant or not or

6  material or not, but there is no dispute, right, that no one,

7  not the Debtor, not anyone, not World Distribution Services,

8  got approval of I'll call it the post-petition services

9  agreement, the email agreement, is that fair?

10          MR. FAWKES:  Your Honor, I mean, while, of course, we

11  argue that the Debtor was authorized to enter into that

12  agreement without court approval, we would -- we would admit

13  that agreement was not separately brought to the Court for

14  approval.

15          THE COURT:  What about the DIP lender?

16          MR. FAWKES:  Or the DIP -- well, I guess, Your Honor,

17  I don't know if it was brought to the DIP lender or not.

18          THE COURT:  So, there's nothing in the record that

19  says --

20          MR. FAWKES:  There is nothing in the record that

21  would suggest that it was.

22          THE COURT:  That it was.

23          So -- so, and -- and your position on -- on all of

24  that is that it wasn't needed or it was the Debtor's burden to

25  do that --

1          MR. FAWKES:  That is correct, Your Honor.

2          THE COURT:  -- is that fair?

3          MR. FAWKES:  That is fair, Your Honor.

4          THE COURT:  Is there any gloss on that or that's

5     pretty much it?

6          MR. FAWKES:  I mean, the position we have, Your

7     Honor, is that the critical lien order gave a broad grant of

8     authority to the Debtors to implement the provisions of that

9     order, and the Debtor approached us, as a critical lien vendor

10    designated as a vendor, and we negotiated an agreement in

11    accordance with that order that had a number of terms to it and

12    a number of acknowledgments to it.  And one of those was what

13    we call the ordinary course acknowledgment.  That is what we

14    are now fighting about today.

15         THE COURT:  But the critical lien order, but that

16    didn't really get to -- that didn't really get to pre-petition

17    claims?

18         MR. FAWKES:  Well, it does, Your Honor, in that --

19         THE COURT:  I mean, it didn't get to -- I'm sorry --

20    things like the -- like the preferences and things like that?

21    That didn't -- that didn't --

22         MR. FAWKES:  Well, Your Honor, first off, the

23    critical lien order does expressly state that the Debtors were

24    authorized to make payments --

25         THE COURT:  And that's the payment --

1          MR. FAWKES:  -- on account of pre-petition claims.

2          THE COURT:  Right.  And that 300-and-whatever-

3 thousand dollar payment was made pursuant to the critical lien

4 order?

5          MR. FAWKES:  Yes.

6          THE COURT:  Yeah.  But the rest of that agreement is

7 what I'm asking you now.  What -- that's really what I'm asking

8 about, because you seem to be saying to me that the rest of

9 that agreement was authorized by the critical lien order.

10          MR. FAWKES:  We have -- what we have, Your Honor,

11 first off, we have the Debtors acknowledging, in the agreement,

12 itself, that they were authorized to enter into the agreement,

13 and this was a term of the agreement.

14          THE COURT:  And that no approvals were necessary?

15          MR. FAWKES:  And that no approvals were necessary.

16 And, so, Your Honor, you know, the position we take here is,

17 well, first off, we would certainly agree that the Debtors were

18 authorized to enter into this agreement and were authorized to

19 issue the ordinary course acknowledgment, but, even if the

20 Debtors weren't authorized to do that, it would seem highly

21 inequitable for that to be used against us in the context of

22 this preference action when we clearly relied upon the Debtor's

23 representation that it was authorized to enter into the

24 agreement.

25          THE COURT:  Okay.  Okay.  So, then, on the specific

1   preference issues -- or alleged preferential transactions, the

2   statement -- I'm sorry.  It's not ambiguous to me or confusing.

3   I understand exactly what everyone was getting at, and I think

4   everyone understands what was being attempted to get at right

5   there.  To say it's ambiguous or whatever the word was -- I'm

6   sorry.  I knew -- I knew exactly what they were talking about.

7   I think the Debtors knew exactly what they were talking about,

8   and I think the Plan Administrator knows exactly what they were

9   talking about, so I'm not -- I'm not really impressed with that

10  argument that it is somehow ambiguous.

11          But, on those -- on those payments, the statement is

12  -- you could say it's a conclusion.  I don't think it's a

13  stretch to say it's a conclusion.  I think it's a stretch to

14  say it's ambiguous, but I don't think it's a stretch to say

15  it's a conclusion.  And do I have to accept a conclusion like

16  that?  Like, that's -- I think that's the Plan Administrator's

17  argument, generally, at page 14 and 15, I think.

18          MR. FAWKES:  That Your Honor doesn't have to accept a

19  conclusion?  Well, Your Honor, again, I go back to the fact

20  that the Debtors were represented by sophisticated counsel who

21  clearly know what the import of an ordinary course

22  acknowledgment is.  The Debtors certainly did not have to issue

23  that ordinary course acknowledgment if they didn't agree with

24  the conclusion, and, in fact, I would suggest that, if they

25  didn't agree with the conclusion that it would have been

1 completely improper for them to have issued the

2 acknowledgments.  The fact that they are agreeing to the

3 conclusion, yes, I think it's relevant because there is a due

4 diligence requirement that a plaintiff, in a preference action,

5 has to exercise in connection with filing a preference action.

6 And if the -- if the very party that is asserting the claim has

7 previously represented its belief that the defendant has a full

8 affirmative defense to the claim, then I think, as a -- you

9 know, as a matter of course, under Section 547, the plaintiff

10 can't bring the claim.

11        THE COURT:  But -- but aren't a lot of those cases

12 that they cited similar but not the same because they -- they

13 were -- I think it was mostly in an affidavit or something like

14 that.  This is an agreement, so I understand that that's not

15 exactly the same.  But they do have a certification from Mr.

16 Goldberg that says a couple of things that are material, I

17 think.

18        One is that 40 percent of the preference -- of the

19 payments during the preference period were outside the pre-

20 preference period, and that there were emails that show

21 collection pressure, and, you know, change of terms at that

22 time.

23        So, you know, in other words, is an admission

24 dispositive?  Let's just say that's an admission.  It is an

25 admission.  In every case, there's an interrogatory that says,

1  does the other side contend there is any admissions, and so, if

2  there is an admission, you know, you tell the other side, and

3  most people object, but you tell the other side, and then you

4  say, yeah, but we admitted that, but then there's these other

5  facts that make it not dispositive.

6          So, that's what I'm trying to understand is that why

7  is that -- it is an admission.  I'm saying it's an admission.

8  I guess there's a difference, right?  An admission is evidence,

9  but evidence need not be dispositive.

10          MR. FAWKES:  Well, Your Honor, I'll try to unpack

11  that a little bit here.  First, I mean, I would contend that

12  Mr. Goldberg is trying to substitute his own judgment for that

13  of the constituent he represents, which is the Debtors.

14          Let's say -- let's say, hypothetically, here, that we

15  issued requests for admission on the Debtors, admit that each

16  and every transfer made to World Distribution Services was in

17  the ordinary course of business of the Debtor and the

18  transferee, and the Debtor said, and it's responds to that,

19  admit.  I would be coming before Your Honor on a motion for

20  summary judgment, and I would say, based on that admission, the

21  Debtor has acknowledged the existence of a full affirmative

22  defense, and summary judgment must be entered in our favor --

23          THE COURT:  Okay.

24          MR. FAWKES:  -- irrespective of whether there might

25  be some facts out there that might call into question that

1 admission.  The Debtor has admitted it.  I don't think there is

2 any difference here, Your Honor.

3        THE COURT:  Well, I think -- in fairness, I think

4 there is a difference in that -- in that, it's not in a request

5 for admission.  It was just -- it was in a -- not just.  It was

6 in an agreement.  And let's just say -- let's just say we

7 didn't have all of the other agreements, all of the other

8 consideration that your client asserts to have provided.  And

9 it's just -- there was just a statement somewhere that said,

10 like, the -- like the Vanguard or whatever case it is from

11 Judge Wiles in the Southern District, that was a general

12 statement that said, yeah, all of these payments were in the

13 ordinary course, so the Debtor in possession doesn't get to

14 challenge that, which is, essentially, what happened in

15 Vanguard.  But I understand the differences, also, in that it's

16 -- you know, that's why I said take out all the other things.

17        If we take out all the other things, you know, waiver

18 of claims, the -- the providing of the services and, you know,

19 all the other parts and portions of the agreement, because

20 that's what makes this different, to me, in a lot of ways and

21 in a lot of these other cases.  The other cases weren't really

22 included.

23        MR. FAWKES:  Well, right.  In the Voyager case, Your

24 Honor, I mean, that was a more generalized statement made in

25 the context of, I believe, a plan and disclosure statement,

1  right, not dealing with a specific preference action or a

2  specific preference recipient.  It was more of a throw-away

3  general statement, and that was the type of statement that

4  Judge Wiles criticized, right, as being "broad brush."

5        Here, I don't think we have a broad-brush statement,

6  because we have a statement made by the Debtors with respect to

7  a specific defendant with respect to specific transfers.

8  Right?  It was a -- and, to be fair, I mean, there is no --

9  there is no dispute here, we requested that ordinary course

10  acknowledgment, right?  But the Debtors were empowered to

11  either agree to it or not agree to it.  And the Debtors elected

12  to agree to it.  So, it was a specific -- a specific defendant,

13  a specific set of transfers, and the Debtors had a specific

14  acknowledgment.

15        I think that brings us outside of the purview of

16  Voyager, which was more generalized and presumable, yes.  I

17  suppose every defendant could have jumped on the bandwagon in

18  Voyager and said, well, the Debtors made this generalized

19  statement in the plan and disclosure statement and had the

20  effect of foreclosing all preference actions from being

21  prosecuted.  We're not saying that here, obviously.

22        THE COURT:  No.

23        MR. FAWKES:  We know there's many other preference

24  actions being prosecuted.  I have no idea if there are similar

25  issues in any of those other cases.  But, again, we have a

1  specific agreement related to a specific defendant.

2        THE COURT:  Okay.  All right.  I'm just not -- I'm --

3 in isolation, I have a little bit of a problem with it.  In the

4 context of the whole transaction, I have a -- it makes it

5 different to me.

6        And then, so, I started this out by saying, you know,

7 there is no dispute that the approval of the Court was not

8 obtained, and there is no evidence that the approval of the DIP

9 lender was obtained.  So, and there is an allegation that

10 there's two million dollars worth of preferences that were

11 settled, resolved, disposed of, however you want to term it,

12 without that note and without that approval.  What is the

13 impact of that?

14        MR. FAWKES:  The impact of that is that the Plan

15 Administrator shouldn't be able to pursue the preference, plain

16 and simple.  That's it.  I don't think -- I don't -- I don't

17 read there being any sort of greater conclusion to be reached

18 from that.  In fact, I would -- you know, what we tried to --

19        THE COURT:  What about those cases that say you

20 need --

21        MR. FAWKES:  Well --

22        THE COURT:  All of those cases say, yeah, I mean,

23 it's binding on a successor, and this plan, administrator is

24 not a successor.

25        MR. FAWKES:  I would agree with that, Your Honor.  I

13

1   think -- I think the fact -- yes, the vast bulk of the case law

2   that has been decided in both parties' briefs really deal with

3   Chapter 7 Trustees more than they deal with a plan

4   administrator-type individual.  But I would contend, Your

5   Honor, that, if things like this are binding on a Chapter 7

6   Trustee, they'd be even more binding on a plan administrator,

7   who is simply a continuation of the very party that entered

8   into the agreement with us, right?

9       This is not a situation where it's an entirely

10  unrelated third party stepping into a situation and saying, oh,

11  apparently there's this agreement; am I bound or am I not bound

12  by it?  For all intents and purposes, this party made the

13  agreement.

14      THE COURT:  This is the -- the wind-down Debtors are

15  the entity that made the agreement?

16      MR. FAWKES:  Correct, correct.  It's the same exact

17  party.  And so, I think it's even more troublesome, in this

18  instance, that we have the Plan Administrator trying to attack

19  an agreement that his own constituent made.

20      THE COURT:  So, what part of the critical lien vendor

21  order are you referring to that allowed this whole kind of

22  agreement without -- without any approvals?

23      MR. FAWKES:  Well, Your Honor, there's a catchall

24  provision in the critical vendor order.

25      THE COURT:  I'm there.

1          MR. FAWKES:  I'm looking for it myself, Your Honor.

2 Okay.  Sorry, Your Honor.  We're trying to find it.

3          THE COURT:  No, that's okay.  Take your time.  Looks

4 like you have some able assistance there.

5          MR. FAWKES:  Yes, I do.

6          (Pause.)

7          THE COURT:  I see the part about, you know, the

8 customary trade terms and all that and --

9          MR. FAWKES:  Yeah.  I want to say -- I want to say it

10 was, maybe, paragraph 15 of the order.  I apologize, Your

11 Honor.  I should have actually had a copy in front of me here,

12 and I don't.

13          (Pause.)

14          THE COURT:  Fifteen is "all actions reasonably

15 necessary and effectuated."

16          MR. FAWKES:  That's -- that's what I -- yes, that's

17 what I was referring to, "all actions reasonably necessary."

18 Your Honor, I mean, look, the ordinary course acknowledgment, I

19 know Your Honor asked questions about taking that in isolation,

20 but, I mean, the fact is, it is an integral part of an entire

21 contract, right, that dealt with a whole host of different

22 things, including the provision of substantial post-petition

23 services, the payment for those services, the waiver of claims.

24 And so, it's a component of the consideration that was -- that

25 was provided in exchange for a number of other transactions

1  that, you know, amounted to over $20,000,000 worth of value

2  being provided to the Debtors.

3          THE COURT:  Those -- those are factual issues, if you

4  get to the $20,000,000.  How do I know that?

5          MR. FAWKES:  Oh, I don't -- I mean, I don't think we

6  need to even look at that.  Yes, I'm making that statement, but

7  I don't think Your Honor needs to decide that in order to

8  decide --

9          THE COURT:  They know that.  I think the Plan

10  Administrator knows what was in the warehouse and not in the

11  warehouse.

12          MR. FAWKES:  Well, I would hope so, Your Honor.  I

13  mean, the Debtors clearly knew what was in the warehouse --

14          THE COURT:  The Debtors clearly knew.

15          MR. FAWKES:  -- because they wanted the goods, and

16  they approached us to work out a deal whereby they would get

17  those goods.  And, obviously, the warehousing and delivery of

18  goods was something that WDS had been providing to the Debtor

19  for --

20          THE COURT:  And this is -- this is where the law and

21  reality, sometimes, part ways, right, because the law is that,

22  you know, if there is a disputed factual issue, you know,

23  that's material, summary judgment is not appropriate, even

24  though everyone knows, in their heart of hearts, that what is

25  really -- what really happened, that, for example, like the

1  long list of alleged preferential payments on account of

2  antecedent debt, that's what -- you know, that's the Debtor's

3  records.  That's, the Debtor knows that that's what happened.

4  And, nonetheless, there's an argument that you can also say

5  they were not on account of antecedent indebtedness.

6         MR. FAWKES:  Well, Your Honor, we are acknowledging

7  each and every transfer that is in Exhibit A to the complaint

8  was made on account of an antecedent debt.  We're not disputing

9  that.  So, if we're talking about disputed facts, I mean, I

10 would actually contend there are no disputed facts here, and

11 that we acknowledge the Plan Administrator, you know, makes a

12 prima facie case for preferences under Section 547.  The

13 elements are met.  We don't dispute that.

14        We certainly dispute that the elements of a

15 fraudulent transfer claim have been met, under Section 548, and

16 that dovetails into Count 2 of the complaint, which we

17 definitely think summary judgment should be entered in our

18 favor.

19        THE COURT:  I understand.

20        MR. FAWKES:  But if we're talking about the 547 count

21 alone, we acknowledge the prima facie case has been met, and

22 we're talking about, now, affirmative defenses, and we are

23 arguing that the acknowledgment made by the Debtor constitutes

24 an affirmative defense and disposes of this case.

25        THE COURT:  But are you really saying it's an

1 affirmative defense or it's an agreement that they should be

2 held to?

3      MR. FAWKES:  It's an agreement, by the Debtors, that

4 there is an affirmative defense, yes.  So, it's not -- I think

5 it is important to distinguish between the Debtor outright

6 burying that preference claim and saying, we're releasing you

7 from the preference claim.  They did not do that, right?  They

8 did not release us from any avoidance claims in the critical

9 lienholder agreement we entered into.  Rather, they

10 acknowledged the existence of an affirmative defense.

11      Now, perhaps, the Plan Administrator might say,

12 potato/potato, it has the effect of waiving the preference

13 claim.  And I would say, it doesn't waive the claim, but it

14 introduces an affirmative defense to the claim.  It didn't

15 introduce affirmative defense to any other type of avoidance

16 action claim, right?  So, if there had been, for instance, a

17 legitimate fraudulent transfer argument here, the ordinary

18 course acknowledgment wouldn't have impacted the Plan

19 Administrator's ability to pursue that claim.

20      THE COURT:  It might have some impact.  If a -- if a

21 payment was made in the ordinary course of business of both

22 parties, it's probably not a fraudulent transfer.

23      MR. FAWKES:  Well, I mean, look --

24      THE COURT:  I mean, I don't know.

25      MR. FAWKES:  -- well, it's -- it's -- well, I mean,

1    unless the ordinary course of business for the parties was to

2    engage in fraudulent transfers.  I certainly --

3              THE COURT:  Wow.

4              MR. FAWKES:  -- I --

5              (Laughter.)

6              THE COURT:  Well, you really went a -- you went a

7    long way on that one.

8              MR. FAWKES:  I retract that statement, Your Honor.

9              THE COURT:  Okay.  I get it.  All right.  So, all

10   right -- so, okay.  And I guess I -- I guess I'm not sure what

11   your answer is to the question that I asked is that if -- if

12   court approval was required of this, what is the impact of that

13   on this agreement?

14             MR. FAWKES:  If court approval was required, what is

15   the impact on this agreement?  Again, Your Honor --

16             THE COURT:  If they were wrong -- let's say they were

17   wrong.

18             MR. FAWKES:  Well, I guess --

19             THE COURT:  Kirkland and Ellis and Bed, Bath and

20   Beyond, a huge corporation, one of the best law firms in the

21   world, they were wrong.  They made a mistake.

22             MR. FAWKES:  Yeah, well, I think they were right,

23   but --

24             THE COURT:  Yeah, I know, but let's just say they

25   were wrong.

1          MR. FAWKES:  But, well, I guess we'll play out the

2   hypothetical that they were wrong, I don't think that should be

3   held against my client, Your Honor.  I think the Debtor made --

4   they made their bed.  They made their agreement.  We performed.

5   We honored our agreement.  We honored our end of the agreement.

6   They goods got delivered.  The Debtors paid us.  I think the

7   fact that they paid us is indicative of the fact that we got

8   the goods to them that they had requested.

9          We're now -- we're now years after the fact.  We're

10  being sued for $3,000,000, and we're relying -- we relied on

11  this agreement in presenting this motion for summary judgment

12  and in defending this case, and I think to have that agreement

13  taken away from us and not be able to be used by us when we

14  bargained for it, I mean, I view that as being a huge problem,

15  of course, and I would say Your Honor should -- should estop

16  Mr. Goldberg from asserting that the agreement isn't binding.

17         THE COURT:  Doesn't it stop from getting into, like,

18  what the reliance part?  You just said it.  Where do I, you

19  know, do I kind of, do I have that in front of me?

20         MR. FAWKES:  Do you have that we relied on the --

21         THE COURT:  Yeah, I mean, it's -- it's --

22         MR. FAWKES:  We have an affidavit from our client,

23  yes.

24         THE COURT:  It's, perhaps, as you say, self-evident,

25  but I -- but, I mean, do I actually have that?  That's where I

1  say, sometimes, the law and the reality diverge.  In other

2  words, if somebody may have even said that they relied on it,

3  but they're saying they need discovery on it.  That's what they

4  said.  I know you're shaking your head, but isn't that what

5  they said?  Yeah.

6          MR. FAWKES:  They need discovery on the question of

7  whether we relied upon it?

8          THE COURT:  Yeah, whether you relied on it; how much

9  it was really worth; whether you're lien was a head of the DIP

10 lender's.  I think those -- that doesn't, maybe, cover it, but

11 that's most of it.

12         MR. FAWKES:  Again, I feel like we're getting into

13 some dangerous territory where we're going to second guess the

14 actions of a Debtor in possession long after the fact on an

15 agreement that they stated, and we relied upon the fact, that

16 they said they could enter into this agreement without court

17 approval.  I think we were justified in relying upon that

18 statement in entering into our agreement.

19         If the Debtors had said, hmm, you know, you're asking

20 for something that I think is a little bit problematic for us;

21 we don't necessarily disagree with it, and we'd be happy to

22 give it to you, but we think we've got to run this up the totem

23 pole.  We think we have to reach out to the DIP lender.  We

24 think we have to file a motion with the court for approval.

25         Okay.  They could have done that.  But, again, we are

1  talking about Kirkland and Ellis, a highly sophisticated law

2  firm that's been in front of Your Honor many times before, and

3  they certainly -- they certainly made a judgment call as to

4  whether they thought they needed court approval.  And the

5  judgment call they made was that they did not.  And -- and if

6  we're going to second guess that decision now, two years-plus

7  later, I mean, that's done to our detriment.

8          Again, the Debtor's got the benefit of the bargain

9  for the agreement that we entered into, and we'd be --

10          THE COURT:  Now, circle back.

11          MR. FAWKES:  Yeah.

12          THE COURT:  Aren't you saying they're breaching the

13  agreement?  That's what you're saying.

14          MR. FAWKES:  Well, if -- to the extent that this

15  ordinary course acknowledgment's not honored, I would contend

16  it would be a breach of the agreement.

17          THE COURT:  The ordinary course acknowledgment and

18  the court approval acknowledgment.  Aren't they -- aren't they

19  -- those are the two things that I think the Plan Administrator

20  is taking issue with in that agreement.

21          MR. FAWKES:  I certainly agree that that's what

22  they're taking issue with, yes.

23          THE COURT:  Not the part about getting the goods.

24          MR. FAWKES:  No, no, no.

25          THE COURT:  You're okay with that.

22

1          MR. FAWKES:  No, the Estates were more than happy to

2    get the value of the goods, but deprive us of the value that we

3    bargained for, right.

4          THE COURT:  Not the part about the services for the

5    $3,000,000?  That's okay?

6          MR. FAWKES:  Right.  So, we're cherry-picking the

7    provisions of the agreement that they like.

8          THE COURT:  So, isn't that a -- so, and I am going to

9    ask the Plan Administrator this -- isn't what we're talking

10   about here a breach, but I don't think it was actually said

11   explicitly, but aren't we talking about a breach of the

12   agreement?

13         MR. FAWKES:  Well, I mean, Your Honor, the

14   interesting thing here is that the Debtors in possession, they

15   didn't breach the agreement, right?

16         THE COURT:  Yeah.  No, they did.  Well, you say the

17   Debtors in possession, if you're right -- if they're right, if

18   the Plan Administrator is right, this is the conundrum here or

19   the circle, if the Plan Administrator is right, he's saying

20   that he breached the agreement, I think.  I think that's the

21   argument, he's allowed to breach the agreement.  That's what

22   he's saying.

23         MR. FAWKES:  I'm not sure if that's what he's -- I

24   guess we'll have to hear what the Plan Administrator has to say

25   about that.

23

1          THE COURT:  Well, he said, here's the -- as I

2     understand it, he is saying -- and you can correct me if I'm

3     wrong -- not bound by the ordinary course representation,

4     right?  Is that right?

5          MR. BROWN:  Correct, Your Honor.

6          THE COURT:  Not bound by the representation that no

7     court approval was required.

8          MR. BROWN:  Correct.

9          THE COURT:  Why?  I'm going to ask, and then I'm

10    going to talk to --

11         MR. FAWKES:  Would you like me to cede the podium,

12    Your Honor?

13         THE COURT:  Yeah, yeah, yeah.

14         MR. FAWKES:  Okay.

15         THE COURT:  Why?  You can just walk away from two

16    material provisions of an agreement and then enforce the rest

17    of them or -- and I'm sorry, not enforce the rest of them --

18         MR. BROWN:  Your Honor, Nick Brown --

19         THE COURT:  -- reap the -- reap the benefit of them,

20    and then say, yeah, we don't want those anymore.

21         MR. BROWN:  Nick Brown, on behalf of the Plan

22    Administrator, Your Honor, good morning.

23         THE COURT:  Good morning.

24         MR. BROWN:  We have cited I don't know how many cases

25    where a Court has revisited an agreement or a stipulation or a

24

1  statement made by a Debtor, a Debtor in possession, that,

2  effectively, that a claim was being waived, and then that

3  agreement was never approved by the court, and, in some cases,

4  that agreement was just -- that statement was just part of a

5  whole group of other terms of an agreement, for example, in the

6  Bridge Info Systems case out of Bankruptcy Court of Eastern

7  District of Missouri.

8          THE COURT:  Which one is that?

9          MR. BROWN:  The Bridge Info Systems case, Bankruptcy

10 Court, Eastern District of Missouri.

11          THE COURT:  What page are you on?  I'm sorry, because

12 there's a lot of cases cited.

13          MR. BROWN:  Well, Your Honor, I didn't spent a lot of

14 time on the facts in that case, other than to cite it, as one

15 of many examples.

16          THE COURT:  Well, where did you cite it?  That's all

17 I'm asking.

18          MR. BROWN:  All right.  If you'd excuse me for a

19 minute?

20          (Pause.)

21          MR. BROWN:  Pages 20 and 23 are where the citations

22 are located, Your Honor.

23          THE COURT:  Bridge Information Systems.

24          MR. BROWN:  Where a release of a preference claim in

25 a settlement was deemed unenforceable because the release was

1  never approved by the Bankruptcy Court or noticed to creditors.

2       THE COURT:  I have the -- I have -- page 20 has the

3  Voyager case, am I wrong?

4       (Pause.)

5       MR. BROWN:  Excuse me, Your Honor, my citation

6  numbers were slightly off.  It's 19 and 23.

7       THE COURT:  Oh, 19.  Okay.

8       (Pause.)

9       MR. BROWN:  That case, Your Honor, by the way, was a

10  case involving the Plan Administrator.  The Voyager case also

11  involved the Plan Administrator where, arguably, you're dealing

12  with a fiduciary that was not a successor entity technically,

13  to your point.

14       THE COURT:  So, in this -- but that's the -- I'm

15  sorry, maybe I'm -- maybe I'm -- page 19 is Voyager again.  Oh,

16  at the bottom, Bridge Information Systems.

17       (Court reading to self.)

18       THE COURT:  Yeah.  And, in that case, you're saying

19  that it was actually the settlement -- what?  It says an

20  alleged settlement agreement was --

21       MR. BROWN:  There was an alleged settlement that

22  involved a release of claims.  I don't know that the Court

23  addressed whether or not the entire agreement was unenforceable

24  and needed to be thrown out.  I don't -- cherry-picking, to

25  your point, Your Honor, I don't know how all of these Courts

1  have necessarily --

2           THE COURT:  Isn't that --

3           MR. BROWN: -- addressed it.

4           THE COURT:  -- just as a -- just as a lawyer and as a

5  common-sense matter, is cherry-picking something that you're

6  supposed to be allowed to do in a -- in an agreement?

7           MR. BROWN:  No, Your Honor, it's not, but this

8  particular agreement that we have, the defendant is arguing

9  that it includes a complete preference claim waiver.  They're

10 not even --

11          THE COURT:  They didn't say that.  They didn't say.

12          MR. BROWN:  They're not saying that.

13          THE COURT:  They didn't say that.

14          MR. BROWN:  But that's, effectively, what they're

15 asking this Court to impose on the Plan Administrator, an

16 inability to pursue a preference action.

17          THE COURT:  Wait a minute.  Wait a minute.  You see,

18 that's -- this is the rub.  This is the rub.  You, the Plan

19 Administrator, have no more or no less rights and obligations

20 than the Debtors.  Is that a controversial statement?

21          MR. BROWN:  Well, what I'm taking from these cases

22 that we've cited is that if --

23          THE COURT:  They were different.  Those are

24 different.  I don't know.  That's different.  I'm saying, here,

25 you have -- here, you have a Debtor that is in financial

27

1  distress and needs the critical lien order to get goods so that

2  it can sell them at going-out-of-business sales being conducted

3  immediately, right, and in that context, there is a whole

4  agreement.  And everything that happened in that agreement for

5  the benefit of the Debtors has occurred.  And so, now, I'm

6  having -- I'm having a lot of trouble with it.  I'm having a

7  lot of trouble with it.

8          So, now, they just get to say, you know what, we're

9  going to take those goods that World Distribution's delivered

10 to us; we're going to take the services that they provided that

11 got us the goods really, really quickly, so that we could sell

12 them really, really quickly, and then, a year or two later,

13 we're going to say, yeah, those two parts of the agreement,

14 they don't really help us, so, I'm going to walk away from

15 them.

16         MR. BROWN:  Well --

17         THE COURT:  I have a hard -- I have a hard time even

18 saying it.

19         MR. BROWN:  I understand, Your Honor.  I would ask

20 the Court to take a step back and look at the circumstances, at

21 the time, that this agreement was reached, which was about ten

22 days after the petition was filed.  By that point, there had

23 been an interim DIP order entered with the DIP lender.  The DIP

24 order said that the Debtor's ability to dispose of Estate

25 property, including Estate causes of action that exceeded

1  $250,000 of value required notice to the DIP lender; forget

2  about other creditors.  The DIP lender should have --

3            THE COURT:  He didn't do it?

4            MR. BROWN:  I'm sorry?

5            THE COURT:  The Debtor didn't do it?

6            MR. BROWN:  Apparently not.

7            THE COURT:  But, apparently not?  What do you mean,

8  apparently not?

9            MR. BROWN:  No, no, you're right.

10           THE COURT:  If you had that -- if you had that they

11 didn't go, you would have to tell me, and if you had that they

12 did go, you would have to tell me.  I don't have that.  I have

13 that --

14           MR. BROWN:  No, no.

15           THE COURT:  But you're the Debtor position, because

16 you're the Debtor.  I'm not -- I can't separate you, the Plan

17 Administrator, from the Debtor, even though it feels like

18 that's what you're asking.

19           MR. BROWN:  Well, Your Honor, I think that the Plan

20 Administrator does have the ability -- this is -- the Debtors

21 were pre-confirmation, acting pre-confirmation.  The Plan

22 Administrator is post-confirmation, winding down the Estates.

23 The Plan --

24           THE COURT:  They're winding down the Estate of the

25 wind-down Debtors.

1          MR. BROWN:  Correct.

2          THE COURT:  He's not winding down the Estate of

3  somebody else.  He's winding down the Estate of the wind-down

4  Debtors.

5          MR. BROWN:  And --

6          THE COURT:  It's not -- it's -- it's not that it's a

7  successor; it's that they're the same.

8          MR. BROWN:  I read the Voyager case, which involved

9  the Plan Administrator and the Bridge Info Systems case to say,

10 they both involved plan administrators, as similar to this

11 situation.  I -- I understand --

12         THE COURT:  I didn't read the Bridge one that much

13 because your focus was on -- was on the Voyager case.  And the

14 Voyager case, to me, is just really different, because, at the

15 end of the day, that was a disclosure statement that wasn't

16 even -- that wasn't describing a plan that was confirmed.  And

17 the plan that was confirmed reserved the causes of action.

18 It's completely different.  And that was a judicial estoppel

19 case.  Nobody is talking about judicial estoppel here --

20         MR. BROWN:  No.

21         THE COURT:  -- that I -- that I saw, but I think that

22 might have been in the papers.  But I don't see judicial

23 estoppel.  I see equitable estoppel, and I see that argument.

24 I see that argument.  I really see that argument.

25         MR. BROWN:  Well, and if I could briefly address that

1  argument, Your Honor?  And I do believe that we don't have

2  enough before the Court, today, to decide one way or the other

3  if there was equitable estoppel on a summary judgment motion.

4  But, I'd ask the Court to keep in mind that the agreement, the

5  email agreement, was drafted by the defendant.  There is no

6  preference claim waiver in the agreement, and that is by

7  design, I will submit to Your Honor.

8         So, we're left with this language that, yes, the

9  defendant knew what they were doing when they asked to have

10 that in there, but they also knew, Your Honor, I will -- I

11 would argue, after we've done discovery.  The defendant knew

12 that that's a lot less safe and less likely to be upheld by a

13 Court than an outright preference claim waiver.

14        And I will also submit to Your Honor, the defendant

15 was represented by sophisticated counsel, as you can see before

16 you.  They know --

17        THE COURT:  What about your guys?

18        MR. BROWN:  Both sides, no doubt.

19        THE COURT:  I can't -- that's not going -- that

20 argument that, you know, they were represented by sophisticated

21 counsel is just irrelevant because the Debtors were represented

22 by sophisticated counsel, and they were as sophisticated as can

23 be.  And Kastin, wasn't he the Chief Legal Officer?

24        MR. BROWN:  Yes, Your Honor.

25        THE COURT:  He signed off on it.

1         MR. BROWN:  He did.

2         THE COURT:  He signed off on it.  And then, Kirkland

3 and Ellis approved it.

4         MR. BROWN:  But what's missing, Your --

5         THE COURT:  So, and you guys said that they didn't --

6 that Kirkland and Ellis didn't approve it, but they did.

7         MR. BROWN:  No, no.  Well, I don't know what we said

8 about Kirkland and Ellis, but --

9         THE COURT:  You said that they didn't have -- they

10 didn't -- that counsel wasn't involved, and they were.  They

11 approved it.

12         MR. BROWN:  They had the email, you're right.  They

13 responded in an email, we are signed-off, something like that.

14 The email that is in evidence from this side is Mr. Kastin

15 saying that we are handling the issues with critical vendors

16 internally, so you can deal with me.  Mr. Kastin said that.

17         But, you're right --

18         THE COURT:  But then -- but then -- and that is

19 exactly what you argued.  And then, the papers say, yeah,

20 Kastin said it's good, and then he obviously was running it by

21 Kirkland and Ellis, and the Kirkland and Ellis attorney says,

22 confirmed or whatever; we sign off on the language.  There is

23 nothing ambiguous about that that I see.

24         MR. BROWN:  And, Your Honor, I'm not -- I'm not

25 disputing that Kirkland and Ellis counsel was copied on those

32

1  -- on the email agreement.

2          THE COURT:  Well, are you disputing -- because I'm

3  going to hold you to it, because now, you're moving away from

4  it a little bit, but I'm going to hold you to it.  Are you

5  disputing that Kirkland and Ellis approved the agreement?

6          MR. BROWN:  No.

7          THE COURT:  Okay.

8          MR. BROWN:  But --

9          THE COURT:  That's my point.

10         MR. BROWN:  So, Your Honor, the problem that we have,

11  the problem that the Plan Administrator has with this agreement

12  is that it was never noticed to creditors or approved by the

13  court, so what do you do, and can you simply circumvent that

14  requirement under 363, which seems very obvious and should have

15  been obvious to both sides by putting in your, you know,

16  unpublished email agreement that no court-approval -- we agree,

17  no court-approval is required?  Creditors are not seeing that.

18  The DIP lender is not seeing that.

19         THE COURT:  I'm troubled by it.  I am troubled by

20  that.

21         MR. BROWN:  And that's what troubles us, and which is

22  why we think that the Court should seriously consider the

23  relief that we're seeking here and not enforce -- I don't know

24  what it is.  It's an acknowledgment -- this is to your point,

25  Your Honor -- a conclusory statement.  Like, it -- it -- okay,

33

1  it's evidence, but it doesn't have much weight when there is no

2  -- they didn't talk about the lateness of the payments or the

3  collection pressure, like you pointed out, Your Honor.  There

4  is nothing in there about that.  It's just a one sentence that,

5  okay, all pre-petition transfers were made in the ordinary

6  course.

7         Well, how much weight would Your Honor give that at

8  trial?  Is that -- does that exclude us from arguing that the

9  affirmative defense of ordinary course of business is not

10  applicable here?  I don't think so.

11         THE COURT:  But you see, I'm trying to make a broader

12  point, and I understand why you're zeroing-in on that

13  particular point, but at the end of the day -- at the end of

14  the day, aren't you doing what we talked about earlier?  Aren't

15  -- isn't the Plan Administrator saying, yes, I get to keep all

16  the benefits of this agreement, except that the -- but -- but,

17  not except -- but the agreements that were for the benefit of

18  -- two key points for the benefit of World Distribution

19  Services are not enforceable?

20         MR. BROWN:  Your Honor --

21         THE COURT:  Isn't that a breach of the agreement?

22         MR. BROWN:  -- Your Honor, my first response is what

23  I was, sort of, going to just before is that let's let the

24  agreement stand, as it is.  It still doesn't preclude us from

25  arguing that the ordinary course defense doesn't apply, because

1  it is a -- it's a statement that has very --

2           THE COURT:  How do you split that?  How -- this is

3  like the severability issue.  How do you severe that off from

4  the -- how do you know that they would have ever entered into

5  the agreement if those two representations weren't there?

6           MR. BROWN:  That goes to reasonable reliance,

7  equitable estoppel, and I think that they knew that there was a

8  -- I don't know how strong of a chance, but definitely a chance

9  that that was not enough.  Where is the preference waiver

10 language?

11          THE COURT:  They didn't have preference language.

12          MR. BROWN:  There's another term in there that says,

13 defendant waives its pre-petition claim.  Well, where's the

14 language saying that the Debtors waive their preference claim?

15 It was that simple, and it's not there, and that's intentional.

16 Defendant drafted that agreement.

17          So, they're coming in here and asking us to treat it

18 like it's unambiguous, and that we've --

19          THE COURT:  What's ambiguous?

20          MR. BROWN:  Only that the language -- I think we all

21 know what they were trying to do.  But they didn't --

22          THE COURT:  Isn't it, like, Horn Book law that if the

23 language is not ambiguous, the Court doesn't need to get into

24 any interpretation or factual issues?  I'm sorry.  You know, I

25 know, the Plan Administrator knows, everyone knows exactly what

1  they -- including the Debtors knew, and Kirkland and Ellis knew

2  exactly what that was about.  I don't know how else to say it.

3          MR. BROWN:  Your Honor, I think the defendant knew

4  that they could not get that precise language, we agree to a

5  preference claim waiver, without getting the Court's approval,

6  and so, they thought, if we use this other language, this

7  acknowledgment of an affirmative defense, maybe we don't need

8  court approval.  But I struggle to see the difference.  It's a

9  distinction without a difference, and I go back to, you know,

10  how easy would it be for Debtors and any number of reasons,

11  where do you draw the line where a Debtor can say in agreement,

12  okay, we agree that, you know, the ordinary course or there is

13  new value even though there is no new value or we agree that

14  this was -- I don't know -- pick your claim; pick your cause of

15  action; pick your affirmative defense.

16          We're talking about Estate causes of action.  This

17  one's worth, maybe, $2,000,000, and there is no notice.  And

18  who is to say that the value, here, the actual consideration,

19  the value of the services that WDS provided post-petition,

20  exceeded the $3,000,000 cash that they paid?  What if this

21  language that we're talking about today was just sort of an on

22  the side, sort of extra comfort that had very little actual

23  value beyond the $3,000,000 that they were getting paid?

24          THE COURT:  So, you're saying it's separate?

25          MR. BROWN:  Well, I -- I --

36

1          THE COURT:  You're saying, don't enforce -- you're

2    saying, don't enforce that part of the agreement?

3          MR. BROWN:  I'm saying, number one, I don't think we

4    need to get there, and number two --

5          THE COURT:  Why?

6          MR. BROWN:  Because --

7          THE COURT:  Aren't you telling me not to enforce the

8    agreement?

9          MR. BROWN:  I am telling Your Honor to find that the

10   acknowledgment -- or I am asking Your Honor to find that the

11   acknowledgment does not equate to a preference claim waiver.

12         THE COURT:  I'm already finding that.  I didn't --

13   I'm not finding that that was a preference claim waiver,

14   because it -- what it -- all it does is it says -- I mean,

15   that's the effect, at the end of the day, but even if it --

16   whatever it is, even -- let's just say it said waiver, let's

17   say it said wavier, okay, and they didn't get the court

18   approval, whose job was that?  Was that -- was that World

19   Distribution Services' job?

20         MR. BROWN:  So, I -- I -- well, they were aware of

21   it, but, clearly, the Debtors --

22         THE COURT:  But whose job was it?

23         MR. BROWN:  The Debtors, if they believed that they

24   needed court approval, they should have come to Your Honor.

25         THE COURT:  How about if the Debtors believed they

1  needed court approval?

2      MR. BROWN:  Well, I think the Debtors should have

3  come to Your Honor, as well.  I mean --

4      THE COURT:  So, you're walking -- this is what's

5  killing me about this.  You're walking away.  You, the Debtors,

6  are walking away from the Debtors.  I mean, it's a fair point,

7  because, you know, that's what's happening.  And I just --

8  that's why I keep focusing on, aren't you saying that you're

9  allowed to breach the agreement, and aren't you repudiating the

10 agreement, and can you do that?

11     MR. BROWN:  Your Honor, that is something that I

12 would  be happy to explore in a post-hearing brief, but I would

13 ask -- or ask Your Honor to consider whether we even need to

14 severe the agreement, because treat the statement as evidence

15 that is probably entitled to very little weight when you

16 compare all of the other facts about the ordinary course

17 defense.

18     THE COURT:  So, if I were to find that they're

19 allowed -- you're allowed to -- the Plan Administrator is

20 allowed to bring these claims, okay, don't I have to say that

21 those two provisions are unenforceable?

22     MR. BROWN:  I don't think so.

23     THE COURT:  Why?  If I enforce them, then you lose.

24     MR. BROWN:  What -- what -- well, what is the -- it's

25 not a preference claim waiver.  It's a statement that pre-

1 petition transfers were made in the ordinary course of

2 business, and, again --

3      THE COURT:  But doesn't it -- but that's what I'm

4 saying, don't you -- how do you separate these parts of an

5 integrated agreement?  And I just can't -- I have a real hard

6 time doing it.  I have a very hard time doing it.  I have a

7 very hard time doing that.  It's just not -- I didn't see --

8 honestly, I'll be completely honest, I didn't see that.  I

9 think I'm raising this in fairness.  I'm saying that this is a

10 breach and a repudiation.  Nobody said that before.  Usually,

11 it's a -- you know, usually, breaches and repudiations are

12 anticipatory, right?  That's when -- law school, anticipatory

13 breach, right, and the contract's in effect, and you say, nah,

14 you know, I can't; I'm not doing it.

15      But, this is -- this is -- that's why this is

16 different, and that's why this is not like those -- I don't

17 think -- I don't know that Bridge case, to be honest.  I know

18 the Voyager case, and I'm convinced that that's different.

19      But what's the difference about this is that there is

20 an agreement on which both sides received benefits.  It's not

21 all a one-way street, at all.  Both sides got benefits.  And,

22 now, I'm saying, two of the material benefits that were

23 bargained for are being -- not are being -- the Plan

24 Administrator is asking me to say they don't bind the Debtor.

25 And I'm having a hard time with that.

1          I'll let you brief it.  I'll let you brief it,

2   because I don't -- I don't want to -- I'll let you guys both

3   brief it.  I don't -- I don't think it's fair for me to raise

4   an argument, and then -- and I don't want to spend a lot of

5   your time and money on it, but I also want to be fair, and I

6   don't want to -- I don't want to, you know, surprise you, but I

7   -- you see which way I'm leaning, right?

8          I mean, it's pretty clear, right, what I'm saying.

9   I'm having big problems with it.  At the end of the day, I

10  think the Plan Administrator is trying to benefit from his own

11  entity's breach of the agreement.

12         MR. BROWN:  Okay, Your Honor, and I appreciate you

13  identifying the main points and concerns.

14         THE COURT:  But, now, let's get to the ones I have

15  even more problem with.

16         MR. BROWN:  Okay, let's go.

17         THE COURT:  Okay.  I'm not getting Count 3 at all.

18  What is the issue in Count 3?  There was a critical lien order.

19  The three hundred thousand, they asked -- they said you're a

20  critical lien vendor.  They get -- ask for a $300,000 payment.

21  It gets made after the petition.  What is the issue?

22         MR. BROWN:  Your Honor, that is the one that I

23  understand the defendant points the most at.  So, you and I

24  agree, Your Honor.  At the time we filed the complaint, it was

25  very hard for us to determine, from the Debtor's records, what

1  payments were made under the critical lien order.

2          Since that time, we've had a mediation.

3          THE COURT:  That didn't go so well?

4          MR. BROWN:  It didn't go so well.  But we did not

5  push the post-petition payment.

6          THE COURT:  Yeah.

7          MR. BROWN:  Since that time, I have informed defense

8  counsel we're not going to push it, but we'd like you to drop

9  the request for sanctions for us putting it in the complaint in

10 the first place.  As of today, it's still out there, but, Your

11 Honor, we're not pushing it.  Everything I can tell, it's

12 pretty clear that was made under the critical lien order.

13         THE COURT:  And, to me, that was -- I said it -- it

14 was very -- it was undisputed evidence that there was a -- the

15 payment was made, that they were declared a critical lien

16 vendor, and the payment was made post-petition.  So, it was

17 authorized.  It falls under 549(b)(2) or whatever it is.

18         MR. BROWN:  Yeah.

19         THE COURT:  And it's authorized.  And I -- you know,

20 I understand wanting to get the waiver of the sanction thing,

21 and I understand that.  And, you know, I'm dismissing it, now,

22 and I'm saying that summary judgment is appropriate, because

23 there is no disputed facts.  And there is no -- there is no

24 issue, and you -- and I appreciate your candor.  I appreciate

25 your candor, because a lot of times, lawyers stand up here and

1  say stuff that they know that you know in your heart of hearts

2  that they're not really believing.  And I think that was -- I

3  appreciate you being candid about that.  And that'll go into my

4  consideration of, overall, everything, the sanctions and all of

5  that.

6          MR. BROWN:  Thank you, Your Honor.

7          THE COURT:  And then -- and then, I get the point

8  about inconsistent pleading.  I used to be -- I was a lawyer

9  for a long time.  I get it.  I get it.  And I read the Patt

10 case.  I understand what Judge Goldblatt -- he's amazing --

11 writes thousands of opinions, you know.  But I feel that the --

12 it's not inconsistent.  It's contradictory.  It's that --

13 you're saying there is no antecedent debt when you have a

14 schedule that shows -- I don't know, how may are there, there,

15 a hundred?

16         MR. BROWN:  A lot.

17         THE COURT:  A lot of invoice, payment, account of

18 antecedent debt.  So, and then, to suggest, in the face of

19 that, that -- you know, I understood the plausibility as

20 opposed to, like, you know, possibility.  Like, plausibility as

21 a much different standard.  I don't know.  I have no idea.  But

22 this is the one time I see plausible.  Is it plausible that

23 Bed, Bath and Beyond was paying Word Distribution Services on

24 that regular basis for nothing?  It kind of answers itself,

25 right?

42

1          MR. BROWN:  It does, Your Honor.  Let me just make

2     two quick points.  Number one is, so, my firm is ASK, and we

3     file a lot of preference actions in large bankruptcy cases.

4     And one thing that we have started to do, and this doesn't make

5     it appropriate, but one thing that we have commonly done is

6     plead, as an alternative form of relief, the 548, and it's not

7     prejudicial to the defendant, simply because we're not tagging

8     on additional transfers.  It's the same transfers.

9          We're suing for $2,000,000 that --

10         THE COURT:  Isn't that the point?

11         MR. BROWN:  Well --

12         THE COURT:  You just made the point.

13         MR. BROWN:  Well, I don't know.  I think -- I did not

14    point out --

15         THE COURT:  It's the same transfers.  It's the same

16    transfers.

17         MR. BROWN:  -- well --

18         THE COURT:  It's the same transfers.

19         MR. BROWN:  Well, okay, and so, point number two is

20    oftentimes, not more often than not, but it sometimes happens

21    where the defendant will say, look, we know you're looking at

22    the Debtor's books and records, but ours are different or, we

23    show that some of our invoices were invoiced to a different

24    affiliated Debtor entity.  So, Bed, Bath and Beyond, Inc. is

25    the primary transferor, but there was, I don't remember how

43

1  many affiliated Debtors, and there is an argument, Your Honor,

2  that if an affiliated Debtor was paying the invoices of another

3  affiliate, that that's not payment of an antecedent debt.

4        And, in which case, it would be, we would argue, 548,

5  considered a fraud transfer.  Our evidence, at the time we

6  filed the complaint, was 547 only, not 548, because it's all

7  antecedent debt.

8        THE COURT:  I'm sorry, say that again?  I didn't

9  understand that.

10       MR. BROWN:  I said that the Debtor's records and our

11 interpretation is, yes, it's all antecedent debt, 547.  But we

12 plead 548, because we're beyond the statute of limitations.  If

13 they come back and say, no, you lose on 547, because, actually,

14 some of these invoices were not -- or transfers were not

15 antecedent debt payments, then --

16       MR. BROWN:  I know.  Well, this is refreshing, and I

17 am happy, under these circumstances, and I've told them this,

18 if you'll -- if you're conceding that it's all payment on

19 antecedent debt, then we don't need the 548 claim.

20       THE COURT:  They conceded.

21       MR. BROWN:  And that's enough for me, Your Honor.

22 I'm not pushing it any further.

23       THE COURT:  They made it easy.

24       MR. BROWN:  And this is not something that I'm just

25 brining to light today, all right, as far as considering

44

1 sanctions.  We just haven't been able to --

2          THE COURT:  I'm not setting sanctions today.  And I

3 am not a big sanctions person.  It's got to be pretty egregious

4 to be -- for sanctions for me.  But I am -- I am a big merits

5 person, and I am -- I try to be practical in this, often,

6 unpractical environment.  And I have to be honest with you, I

7 did not see, as I just said, the post-petition transfer claim,

8 and you candidly acknowledge it's not there.  So, I'm

9 dismissing it.

10         And I did not see the fraudulent transfer claim,

11 because they admitted that you -- you pled, and they admitted

12 that it was all on account of antecedent debt, so there is no

13 claim for the fraudulent transfer.  I'll do that -- you know

14 what I'll do, if you want, I'll do that without prejudice for

15 whatever, but it's with prejudice as to the post-petition

16 claims.  I don't -- but you have the records.  You have the

17 records.  It's two years into the case, and I know you got in

18 after the two years or more recently than two years, but if

19 there were any question and even what you just said about,

20 maybe, other Debtors' debts were being paid, one of the things

21 that I've found in this is that corporate formalities are

22 observed or not observed at parties' convenience.

23         If it makes sense to say that they're different

24 entities, then that's what we're going to do today.  If it

25 makes sense to say -- if it's better for us to say that they

1  are one entity, let's say, oh, they were all the same, Bed,

2  Bath and Beyond, it was all the same.

3         You know, I think that's a long haul.  That's a long

4  haul, even if you showed that.  It's not -- I didn't see that

5  in the papers, that argument that you just made.  I didn't know

6  that that was what you were saying, but so, I don't know.

7         I'm sorry, Mr. Fawkes.  I've been -- I had you in the

8  hot seat for a long time, and I'm not trying to limit anybody

9  from saying whatever they want, but I think, candidly, counsel

10 was very forthright with the Court, and I appreciate that.  And

11 I am going to consider that, in connection with sanctions,

12 because I think, you know, people ask for stuff, and they

13 didn't get it; they didn't get the -- you didn't get the no-

14 sanction agreement.  And, you know, they have a client.  They

15 declined, probably, was not happy that they're spending all

16 this money on three lawyers being here, and all of that, and I

17 get it.  But and so, they couldn't waive it.

18        But, now, you came to the Court, and you were candid

19 with the Court, and I'm dismissing that Count 3 with prejudice.

20 I'll dismiss Count 2, without prejudice, just for the time

21 being for whatever -- however long you need to determine

22 whether you want to bring that count, but I think you're going

23 to have a long haul in showing me that those payments, which

24 you alleged, and they agreed were on account of antecedent

25 debts, that were of Bed, Bath and Beyond or one of its

46

1    innumerable affiliates.  Who keeps that straight, really?

2          I'll be honest, when they say you have to file the

3    proof of claim against the entity, and it doesn't count if it's

4    against the wrong entity, I have a problem with it.  But nobody

5    ever objects on that ground.  But I have a problem with it,

6    because it's -- it's not that clean.  It's not that distinct in

7    the real world.  And, you know, so, but if it's ever brought

8    before me, I might have something to say about it.

9          And, so, I'm going to -- I'm going to let you brief

10   that issue.  I don't know how you want to handle that, Mr.

11   Fawkes.  Do you have any thoughts?  Either party, any thoughts?

12         MR. FAWKES:  Your Honor, you think it makes sense to

13   do simultaneous briefing on that, and kind of impose some sort

14   of page limitation, just so we're not overwhelming the Court

15   with a bunch of additional briefing here?

16         THE COURT:  Yeah.  Yeah, I didn't want that.  I just

17   -- but it was my fault, so --

18         MR. FAWKES:  And we're happy to brief the issue, Your

19   Honor.

20         THE COURT:  -- I have to -- I'm sorry?

21         MR. FAWKES:  We're happy to brief the issue, of

22   course.

23         THE COURT:  Yeah.  Because I'm -- and I just want to

24   put some detail on it is that, I just -- I think I said it.  I

25   said, is it -- is it okay for the Debtor to repudiate two terms

1    of an agreement after the agreement has been performed, and

2    what is the remedy for that?

3            MR. FAWKES:  It's a fair question, Your Honor.

4            Your Honor, if I could ask for one more thing?

5            THE COURT:  Repudiated and breached.

6            MR. FAWKES:  Right.

7            If I could ask for one more thing, Your Honor?  I

8    believe there are some pending discovery-related deadlines in

9    the case, and in light of the fact that Your Honor is asking

10   for additional briefing, and in light of the fact that Your

11   Honor is not going to rule on the summary judgment motion,

12   could we suspend those deadlines while this is pending?

13           THE COURT:  Yeah, this won't -- deciding this issue,

14   I think, is a straight legal one, but you can argue otherwise.

15   But I think it's a straight legal one, because I just don't

16   think you can reap the benefits of an agreement and then walk

17   away from two material terms.  I just don't -- don't see it.

18           MR. BROWN:  So, if I may propose ten pages or less,

19   simultaneous briefing due in at the end of the month?  That's

20   two weeks?

21           MR. FAWKES:  Is that okay with Your Honor?

22           THE COURT:  Yes.

23           MR. FAWKES:  That's fine with us.

24           THE COURT:  Yes.  And do you want -- I mean, I'm

25   holding my breath, and I'm saying it, but do you want five

1 pages to reply to each other?

2          MR. BROWN:  I would not want that.

3          MR. FAWKES:  No, I'm fine with not doing a reply.

4          THE COURT:  Okay.

5          MR. FAWKES:  Let's -- let's -- we'll cut to the chase

6 here.

7          THE COURT:  That's fair.  Okay.  That's good.  This

8 is the first time -- this is the first time, in my ten years,

9 that lawyers have said they don't want to take an opportunity

10 to brief something.

11          MR. FAWKES:  Our client spent enough money on this,

12 Your Honor.

13          THE COURT:  And I appreciate that, as well.  I did it

14 because I want to be fair, that's all.

15          MR. FAWKES:  Thank you, Your Honor.

16          THE COURT:  All right.  I am sorry that I'm not

17 deciding the whole thing today, but I didn't think it was fair,

18 as I said to just kind of spring that issue on everyone and

19 decide on that basis without giving anybody a chance.

20          MR. BROWN:  Thank you very much.

21          THE COURT:  And you can appear -- are you from

22 Delaware or where are you from?

23          MR. BROWN:  Me, personally, I live in Virginia.

24          THE COURT:  You came up from Virginia for this?

25          MR. BROWN:  Oh, yeah.

1          THE COURT:  Oh, the (inaudible), right?

2          MR. BROWN:  I'm not going to get into the travel

3  problems I had yesterday.  I am here.

4          THE COURT:  Oh, all right, well, and you guys came

5  from Chicago?

6          MR. FAWKES:  Chicago, Your Honor.

7          THE COURT:  So, you can appear by Zoom, if you want.

8  I prefer people to come in person, and I find this much more

9  effective in a lot of ways, but I don't want you to spend --

10  your clients to spend money that they don't want you spending.

11          MR. BROWN:  I appreciate that, Your Honor.  I'm happy

12  to be here, and thank you for your time.

13          THE COURT:  Thank you.  Thank you.

14          And I appreciate the arguments and the

15  professionalism that was exhibited today.

16          Do we need an order?

17          MR. FAWKES:  Yes, we do, on the briefing.

18          THE COURT:  Because I did order things.

19          MR. BROWN:  Well, we can do a draft, and I'll

20  circulate it.

21          THE COURT:  Yes.  I think it's three things.  Count

22  3, dismissed with prejudice, right?

23          MR. FAWKES:  Yes.

24          THE COURT:  Count 2 dismissed, without prejudice,

25  with leave to amend.  I don't know how much time, but within 30

1  days, and if you don't amend, then it's dismissed with

2  prejudice.  Is 30 days enough for you?

3       MR. BROWN:  Your Honor, in light of the concession on

4  the antecedent debt, it should be more than enough.

5       THE COURT:  Okay.  Thank you.  I said three things.

6  And then there is a briefing schedule on this issue, which you

7  don't have to identify it, and just say that the hearing on

8  Count 1 is adjourned to -- you know what, just -- you said

9  you're going to brief this by July 31st, you said?  Is that

10  what you said?

11       MR. FAWKES:  Yes, Your Honor.

12       THE COURT:  Yeah.  August 1st is a Friday, if you

13  guys care.  Maybe you're taking Fridays off during the Summer.

14       MR. BROWN:  That Friday, I am taking off, Your Honor.

15  I'm going fishing, so --

16       THE COURT:  On August 1st?

17       MR. BROWN:  August 1st, I'll be on the water.

18       THE COURT:  July 31st then.

19       MR. BROWN:  All right.

20       THE COURT:  All right.  So, July 31st, the briefs are

21  due, and then just put a blank for the hearing date, and we'll

22  -- because I don't now, right now, what hearing date we're

23  going to give you, but it could be as early as, like, the 12th.

24  Yeah, it could be as early as the 12th.

25       MR. BROWN:  Can I also put in there that the

1   discovery deadlines are stayed until --

2            THE COURT:  That's the other, right, thank you.

3            MR. BROWN:  Okay, thank you.

4            THE COURT:  Yes.  All the discovery deadlines are

5   stayed, pending a decision on Count 1.

6            MR. FAWKES:  Okay.

7            THE COURT:  Yeah, yeah, pending further order of the

8   Court, how about that?

9            MR. FAWKES:  Very good.

10           MR. BROWN:  Okay.

11           THE COURT:  Yes.

12           MR. FAWKES:  Okay.

13           THE COURT:  All right.  Thank you very much.

14           MR. FAWKES:  Thank you so much, Your Honor.

15           MR. BROWN:  Thank you, Your Honor.

16           THE COURT:  Have a good day.

17                          *  *  *  *  *

18

19

20

21

22

23

24

25

52

1    **C E R T I F I C A T I O N**

2            I, JACQUELINE MULLICA, court approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    official electronic sound recording of the proceedings in the

5    above-entitled matter, and to the best of my ability.

6

7    /s/ Jacqueline Mullica

8    JACQUELINE MULLICA

9    J&J COURT TRANSCRIBERS, INC.        DATE:  July 17, 2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25